1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3       * * * * * * * * * * * * * * * *
        *CHAMPION EXPOSITION SERVICES,  *
4       LLC, et al.                     *
                 Plaintiffs             *       CIVIL ACTION
5                   vs.                 *       No. 10-12228-RGS
                                        *
6       *NEXXT SHOW, LLC, et al.        *
                 Defendants             *
7       * * * * * * * * * * * * * * * *

8

9

10

11              BEFORE THE HONORABLE RICHARD G. STEARNS
                    UNITED STATES DISTRICT JUDGE
12             MOTION FOR PRELIMINARY INJUNCTION, DAY 1
                       February 17, 2011
13

14      APPEARANCES:

15              JACKSON LEWIS, LLP, (By Erik J. Winton, Esq., and
        Brian M. Childs, Esq.) 75 Park Plaza, 4th Floor, Boston,
16      Massachusetts  02116, on behalf of Plaintiffs

17              HINCKLEY, ALLEN & SNYDER, LLP, (By Michael J.
        Connolly, Esq., and Laura B. Angelini, Esq.) 28 State
18      Street, Boston, Massachusetts 02109, on behalf of
        Defendants

19

20                                      Courtroom No. 21
21                                      1 Courthouse Way
                                        Boston, Massachusetts 02109
22

23                    JAMES P. GIBBONS, RPR/RMR
                         Official Court Reporter
24                    1 Courthouse Way, Suite 7205
                      Boston, Massachusetts  02210
25                       jmsgibbons@yahoo.com

```
1                    P R O C E E D I N G S

2         THE CLERK:  All rise for the Honorable Court.

3      Court is open.  You may be seated.

4      This is Civil Action No. 10-12228, Champion Exposition

5   Services, et al., versus Nexxt Show.

6      Counsel, please identify yourselves for the record.

7         MR. WINTON:  Erik Winton from --

8         THE COURT:  I'm sorry?

9         MR. WINTON:  Erik Winton from Jackson Lewis for the

10  plaintiffs, your Honor.  With me is a Brian Childs of my

11  office.

12         MR. CONNOLLY:  Michael Connolly, your Honor, on

13  behalf of all of the defendants, with the exception of

14  Michael Hall.

15         MS. ANGELINI:  Laura Angelini on behalf of the same

16  defendants.

17         THE COURT:  All right.

18      Obviously the paper has come in ferociously in a very

19  short period of time, but I think I have been able to get

20  through most of it.

21      Just to frame where we're going -- just some

22  preliminary thoughts, nothing is fixed in stone -- it would

23  seem from what I have read, including some admissions that

24  are made by defendants in the case, that harm has occurred.

25      There is really one claim in the complaint, and that is
```

PDF created with pdfFactory trial version www.pdffactory.com

1    a Computer Fraud and Abuse Act claim.  And as I take the

2    facts in the light most favorable to the plaintiff, again,

3    even when I weigh in what defendants say did and did not

4    happen in terms of penetration of the computer system, it

5    would seem to meet -- I suppose the leading case would be

6    Cultural Travel v. Explorica [ph] -- what the First Circuit

7    defines as the necessary showing for a claim under that act.

8        But that typically, other than obviously an order to

9    stop doing what you're doing and don't do it again in the

10   future, is a claim that is dealt with by a damages remedy,

11   not by one quite as unusual as the one that I am being asked

12   to impose here.

13       As I understand what plaintiff is requesting, or, I

14   guess, technically "plaintiffs," is an order that

15   defendants, or, more technically "defendant," through its

16   various personalities, be restrained from doing business

17   with the two upcoming companies or associations who are

18   planning expositions, I gather, in the Boston area.

19       Not that I haven't issued injunctions like that in the

20   past, but usually those have occurred where there is a

21   showing of a violation of a noncompete agreement, or at

22   least a claim of a Trade Secrets Act violation, but I don't

23   see that actually in the complaint, unless there is --

24       MR. WINTON:  Yes, your Honor.  There was an amended

25   complaint filed now two weeks ago which had all those claims

PDF created with pdfFactory trial version www.pdffactory.com

1    in it.

2          THE COURT:  Okay.  I had not seen the amended

3    complaint.  I just had the original complaint.

4       I withdraw that then.

5       So now it would seem that the question then is if an

6    injunction like this is going to enter, I gather there is no

7    claim that there is a true noncompete?

8          MR. WINTON:  Actually, your Honor there are two --

9    there -- it's a 15-count complaint now with the amended

10   complaint in there.

11         THE COURT:  What would be the basis for a

12   noncompete agreement?  As I understood your original

13   complaint, the noncompete with Epstein expired on the 15th.

14         MR. WINTON:  It's actually a noncompete with

15   Mr. Szymczak, one of the additional defendants.

16         THE COURT:  And Epstein was --

17         MR. WINTON:  Epstein's noncompete -- we take the

18   position that his noncompete was -- he did violate it during

19   the time period.  We have forensic evidence which confirms

20   that.  So we would be looking for some type of equitable

21   tolling as to that.

22       But our primary basis for the injunctive relief, your

23   Honor, is the misappropriation of trade secrets, the

24   intentional interference with contractual relations, the

25   Chapter 93A violations, the aiding and abetting breach of

PDF created with pdfFactory trial version www.pdffactory.com

1    duty of loyalty by using our employees to help them solicit

2    customers while still employed there.

3              THE COURT:  Not to get ahead of ourselves, but

4    what's the contract that is being interfered with?

5              MR. WINTON:  The contract between us and our

6    customers, your Honor.

7              THE COURT:  Do you have a contract with the two

8    parties that you mentioned?

9              MR. WINTON:  Yes.  We have a contract with NAA

10   that's currently in place through October 2012.

11             THE COURT:  But not with the other.

12             MR. WINTON:  The other one is up for bid right now.

13   We are under contract with -- we are presenting bids for the

14   new contract.  We just did their last show.

15             THE COURT:  You mean interference with prospective

16   business relations.

17             MR. WINTON:  Interference with prospective and

18   advantageous relations, yes, with respect to that customer.

19             THE COURT:  So the issue then is whether, in fact,

20   these are truly trade secrets.

21       The defendant, of course, argue they're not, that it's

22   publicly accessible information.  They make, it seems to me,

23   the widely accepted point that what one carries in life by

24   experience or memory is not something that courts go around

25   enjoining or trying to segregate, as opposed to actually

1    appropriating physical information that's in the possession

2    of someone else.

3        So if that's the case, what do you see would be the

4    harm in proceeding, where I really think defendants are

5    going, and just take a very short period of discovery, and I

6    will give you a trial within 30 days?

7            MR. WINTON:  Well, your Honor, because the

8    irreparable harm is going to be effected within that 30-day

9    period as to both of these customers.  That's why we're

10   seeking -- there's irreparable harm right now.

11       As to trade secrets, if I may, I do have several

12   arguments in response to that.

13           THE COURT:  They're arguments, but I have to have a

14   certain level of proof before I'm --

15       To me, the idea, since I've got several cases settled

16   now, I can give you a jury trial very shortly.

17           MR. WINTON:  Well, your Honor, we haven't engaged

18   in any discovery yet.

19       We have the forensic copies of --

20           THE COURT:  It does not seem to me there is a lot

21   to discover here.  It looks like four or five depositions.

22           MR. WINTON:  I think it would actually be more than

23   that, your Honor.  We have more than that in defendants

24   alone.  We now have eight individual defendants in this

25   matter, all of whom --

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  Eight depositions.

2              MR. WINTON:  And there are some other witnesses as

3    well, your Honor.

4              THE COURT:  Well, maybe I spent too long as a

5    criminal trial lawyer, but we used to go to trial in three

6    weeks.  I'm offering you four.

7              MR. WINTON:  I understand that, your Honor.  I

8    think at this point we are more concerned with what's going

9    to happen in the next week or two.

10             THE COURT:  What's going to happen in the next week

11   or two?

12             MR. WINTON:  Right now, for both of these -- may I

13   move to the podium?  It's a little less bending over for me.

14             THE COURT:  Of course.

15             MR. WINTON:  With respect to both of these

16   customers, your Honor, if we go through each one -- and it's

17   important for us to note that in the opposition, which we

18   received earlier today from opposing counsel, and the two

19   affidavits, there is no denial anywhere in either of those

20   affidavits or anywhere in the memorandum, no denial at all

21   of any of the wrongdoing alleged in our papers, your Honor.

22        So we're talking about forensic support for

23   misappropriation of our business information, reams and

24   reams of electronic information, through different avenues.

25   Some of it was logged on to our computer system from the
```

1    competitor's computer system.  That's how we found out about

2    this.  Others were emailed from people's -- our current

3    employees' personal email addresses to the principals of

4    defendant during their employment.

5        Others were taken and put on an outside holding --

6    Internet holding tank for documents.  This was -- this, by

7    the way, started in September of 2009 by Mr. Epstein himself

8    while he was on our board.  He started this, what's called

9    "Base Camp," which is an online depository, and documents

10   from our client, confidential business documents, were put

11   on that depository.

12       They also didn't deny any of the use of our employees

13   to help them solicit these two customers in particular so

14   that they would be able to jump ship, these customers, as

15   soon as these employees left our employ to go work for

16   Nexxt.

17       So that's a clear breach of duty of loyalty, breach of

18   fiduciary duty, and aiding and abetting of that breach.

19           THE COURT:  Is the allegation that this is still

20   going on today, Nexxt is still accessing your computers?

21           MR. WINTON:  As far as we know, we don't believe

22   they're accessing our computers still.

23       They still do have our confidential information.

24           THE COURT:  You are saying that the ongoing harm is

25   not that they're continuing to penetrate your computer

PDF created with pdfFactory trial version www.pdffactory.com

1  system, but they are making use of what they have stolen

2  already?

3       MR. WINTON:  Exactly, your Honor.

4     In fact, in the two bids that they've submitted for

5  these two individual customers, they used our confidential

6  information in order to propose those bids, and I can get

7  down into the details of that and show you the documentary

8  proof of that very fact.

9       THE COURT:  What if the injunction issued, what

10  would a court do then if one of the -- what would you call

11  them, "exhibitors"?

12       MR. WINTON:  These are our -- you mean our

13  customers?

14       THE COURT:  Customers.

15       MR. WINTON:  Our customers are actually the show

16  producers or trade associations.

17       THE COURT:  What if the producer comes to the court

18  and says, Look, we see this injunction, but we want to do

19  business with Nexxt?  We want them to put the show on for

20  us.

21       MR. WINTON:  That's a frequent issue in noncompete

22  or nonsolicit cases.  And, frankly, if people are

23  contractually or under uncommon law or in any other way

24  prohibited by the Court from doing so, unfortunately for the

25  customer, they're not permitted to use them, and that's

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    something that's a byproduct of restrictive covenants and
 2    trade secret cases.
 3              THE COURT:  Does not the third party then have some
 4    claim of harm to itself?
 5              MR. WINTON:  I'm not sure if they have harm.  And
 6    if they wanted, I guess, to implead and say, Hey, we really
 7    want to use these people, they could take that approach,
 8    your Honor.  But I think if the Court sees the harm to my
 9    client as the more irreparable harm, as opposed to another
10    third party who is not before the Court today, I think
11    that's what's of import.
12              THE COURT:  Typically we take a view, when we
13    enforce a noncompete agreement, the courts generally will
14    not, at least in Massachusetts, enforce an agreement,
15    noncompete agreement, for more than a year, I think is now
16    where it seems to be where the Courts are settling.  Yes,
17    they are enforceable, but there is a point at which they
18    become reasonable in duration, unless there is extraordinary
19    consideration given in exchange for the noncompete.
20         Why would an injunction like this run for over a year
21    into, what is it, January, 2012?
22              MR. WINTON:  Actually, there are two, your Honor.
23    There are two different injunctions.  We're seeking very
24    limited relief here from you today, your Honor.  And in
25    light -- frankly, in light of the wrongdoing which has been
```

1  admitted by the other side, I think we can be seeking far

2  greater, but we wanted to come to the Court with only the

3  limited amount of relief so that it would make it an easy

4  decision and an easy argument.

5          THE COURT:  Describe for me exactly what the relief

6  would like look.

7          MR. WINTON:  The relief is, as to the Yankee

8  Dental, the one customer, we're only looking for a 90-day

9  order that they not solicit, do business with, or compete

10  with us against them.  Because that specific show, the

11  decision is being made on that show within the next few

12  weeks.

13      We initially thought that the decision was being made

14  on February 21.  Plaintiffs -- excuse me.

15      The defendants, in their opposition briefs here today,

16  say they understand the decision is being made on March 3.

17      Now, the reason why we are looking for this, for this

18  specific Yankee Dental show, is that, number one, they used

19  our confidential information to form that bid for that show.

20      So we have a stipulated protective order -- not

21  "protective order," a stipulated order in this matter which

22  was entered by Judge Young.  And in that order Nexxt is --

23  and its servants, agents, and employees, are -- may not

24  disclose or use any confidential information of Champion,

25  including information contained in Champion's documents,

PDF created with pdfFactory trial version www.pdffactory.com

1    computer programs and files, spreadsheets and data sheets,

2    and any other information obtained from Champion.

3        We have, with respect to that bid that was given to

4    Yankee dental, the use of our information.  That bid is

5    still out there.  That's still a bid they are relying on for

6    that client.  Therefore, they are in violation of the order

7    by using that bid, your Honor.

8            THE COURT:  Shouldn't I, before I issue that kind

9    of order, give Yankee Dental an opportunity to be heard --

10            MR. WINTON:  Well, your Honor --

11            THE COURT:  -- as a party in interest?

12            MR. WINTON:  They are a third party here.  I'm not

13    sure whether or not they are a party in interest.  They have

14    several people bidding for their work.  I'm not sure how --

15    if they were to come to you and say, We'd like to use Nexxt,

16    I am not sure of what import that is if Nexxt has violated

17    multiple statutory, common law, and contractual obligations

18    in this matter.

19        Frankly, they're not permitted to do so, even if the

20    customer would want to work with them.  And, again, this is

21    a byproduct of many noncompetition or unfair competition and

22    trade secret theft cases.

23            THE COURT:  I understand the point, but I think the

24    question is a little narrower.  Should they not be at least

25    be given the opportunity to be heard?

1          MR. WINTON:  Yes, your Honor, they may be given the

2     opportunity to be heard.  I think all they would say --

3     first of all, my experience with these cases is that

4     customers usually don't want to get involved with something

5     like this.

6          THE COURT:  I understand that.

7          MR. WINTON:  And if they were to get involved, I

8     think they'd say, Hey, we'd like to work with them.  We want

9     to have our own choice.  And then the Court has to weigh the

10    interest of a nonparty, who wants to work with one vendor

11    among many, against the interest of the plaintiff here who

12    has been wronged, who is going to be irreparably harmed, who

13    has come to the court and made its plea for the court's

14    assistance as a result of that, of those activities.

15         THE COURT:  Maybe you could spend a little bit of

16    time on why this actually involves trade secrets.

17         MR. WINTON:  Absolutely, your Honor.

18         THE COURT:  Assume that I think there is sufficient

19    showing under the Computer Fraud and Abuse Act, I think you

20    have shown you will prevail on the merits of that claim, but

21    why should I believe that these are trade secrets?

22         MR. WINTON:  Well, before I get to that, your

23    Honor, I think, actually of all the claims, it's not just

24    Computer Fraud and Abuse Act.  We do have statutory

25    misappropriation of trade secrets.  Again, with the amended

PDF created with pdfFactory trial version www.pdffactory.com

1    complaint, I know you have not seen that, we do have breach

2    of the duty of loyalty.  We do have Chapter 93A.  All of

3    these together all relate to what these defendants did here.

4        With respect to the confidential information, in order

5    for us to prove that we have confidential information, we

6    have to pass the Jet Spray Cooler [ph.] test, which -- you

7    know, show that the information was not known outside

8    Champion, show that the people within Champion who knew it

9    only had -- knew it on a need-to-know basis, it wasn't

10   broadcast amongst the whole company; that we take steps to

11   protect it, which our client does with password-protected

12   computer programs; that it's extremely valuable to Champion

13   and the competitors.  And that's the case here, your Honor.

14       The papers -- the defendants spend a lot of time

15   talking about pricing of the -- for the exhibitors, right.

16   So the way this industry works is you contract with the

17   trade association or the show producer.  You contract with

18   them for a show management fee so that you'll provide the

19   show.  And then the majority of your revenue is from

20   services you provide to the individual exhibitors who signed

21   up to exhibit at that show.

22       And the -- knowing the exhibit pricing, meaning what

23   we're going to charge the exhibitor for, you know, setting

24   up their table or taking something -- setting up and taking

25   down their booth, or whatever it might be, their

1    electricity, those are all pricing that is out there for the

2    public, agreed.

3          What's not public, your Honor, is the revenue we get

4    from the exhibitor, or all those exhibitors together.  And

5    that's the key piece of information in this industry,

6    exhibitor revenue, because exhibitor revenue allows you to

7    formulate what you're going to charge the trade association

8    or the show producer for the show management fee.

9          In some cases you're going to have a higher show

10   management fee because you know that your exhibitor revenue

11   is lower.  But if you know historically how you've done the

12   show, and you're the only company that's going to know this

13   because you're doing the show, you know the exhibitor

14   revenue is very high, you're going to be willing to discount

15   that show management fee, and possibly even waive the show

16   management fee, just because the exhibitor revenue fees are

17   so high.

18         But that exhibitor revenue information and those

19   exhibitor revenue dollars, that's not shared ever outside of

20   Champion or anyone, just like Nexxt would not share it with

21   any of their competitors.  That's highly confidential

22   information.

23         And tied to that information, your Honor, is gross

24   margin, margin, profit.  What -- how much did you spend on

25   the show and how much did you get, because it's tied to the

1     revenue you received.  That's also highly confidential.

2         All that information, your Honor, is in the possession

3     currently of Nexxt.  It has been in the possession of Nexxt

4     since before they say they even started doing business.

5     They say they started December 16, 2010.  They've been

6     stockpiling that information from a variety of sources for a

7     year prior to that, from September of 2009.

8         And, your Honor, it's so -- it's really a blatant

9     attempt to take all this information, a successful attempt

10    at this information, and you can see -- if -- you can see in

11    the exhibit -- do you have the exhibits there?  I think we

12    gave another copy of the exhibits with tabs on them.  It

13    should be easier for you to review, your Honor.

14        So if you look at Exhibit 20, look at Exhibit 20, that

15    is an email from Mark Epstein -- I'll wait till you get

16    there, your Honor.

17        (Pause in proceedings.)

18            THE COURT:  Okay.

19            MR. WINTON:  So here you have an email from Mark --

20    in October of 2010 from Mark Epstein to Matt Epstein, two

21    Nexxt executives.  Mark Epstein is saying, "In preparation

22    for next week" -- this is about YD, Yankee Dental -- "can

23    you please print out YD from CCA for the last couple of

24    years."

25        "CCA" is a proprietary program on the network of my

1    client, Champion, which Mr. Epstein, Matthew Epstein,

2    admitted to accessing through Citrix, which is the remote

3    server for the computer, 30 times after he left our employ.

4        So here his father and business partner is telling him,

5    Hey, we're preparing our bid for Yankee Dental at our

6    meeting.  Can you go on Champion's network and get the

7    information we need in order to prepare that?

8        And that's exactly what they did, your Honor.  And they

9    used that information.

10       And then what's interesting about the rest of that

11   email is he says, "If you can't for whatever reason" --

12   meaning if you can't get that information -- "please let me

13   know, and I will talk to Susan."

14       "Susan" is Susan Dos Reis, who was a current employee

15   of Champion at the time, who was already working with the

16   Epsteins and Nexxt in order to solicit Yankee Dental.

17       So he's got -- Mr. Epstein is saying, If my son can't

18   unlawfully access the website of -- excuse me -- the

19   internal network of Champion using Citrix, then I'll just

20   use one of their employees whom I've already gotten my hooks

21   into.

22       So this is what we're talking about, your Honor, when

23   we say they used the information from Yankee Dental.

24       And, your Honor, if you look at Exhibit 19, the exhibit

25   before that, it's an even more blatant showing.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1           This exhibit starts with an email from Mark Epstein to
 2      Matt Epstein and John Szymczak about --
 3               THE COURT:  Which exhibit are we on?
 4               MR. WINTON:  I'm sorry.
 5           Nineteen.
 6               THE COURT:  Nineteen.
 7               MR. WINTON:  -- about the presentation they're
 8      about to give to Yankee Dental.  And it goes into the -- the
 9      third page of that exhibit says, "Yankee Dental
10      Presentation" at the top.
11           Do you see that?
12               THE COURT:  Yes.
13               MR. WINTON:  And that's a, for a better word,
14      that's an outline for their presentation.
15           Now, if you turn one more page, it says, "as our
16      corporate headquarters" -- do you see that?
17               THE COURT:  Yes.
18               MR. WINTON:  If you move down to No. 3., "Our Avon
19      Mass warehouse" -- do you see that?
20               THE COURT:  Yes.
21               MR. WINTON:  Later on in that paragraph in
22      parenthesis is says, "(Here is where to recite union
23      warehouse labor wages and benefits, right from CCA,,,,, bang
24      this one home in a big way.)"
25           So, again, as part of their actual presentation outline
```

PDF created with pdfFactory trial version www.pdffactory.com

1    to Yankee Dental, he's telling -- Mark Epstein is telling

2    them, use the information from the proprietary Champion

3    program -- and, by the way, that's Champion's most sensitive

4    financial information.  It has all their financial, revenue,

5    profit margin, constantly updated for historical, shows back

6    to 2006 through to the future, shows that they're about to

7    produce.  It's the crown jewels of what they have, and they

8    were accessing it and they used it.

9         Now here, your Honor, I will let you know that

10   Mr. Epstein addresses -- attempts to address this in his

11   affidavit by saying that where he wrote this, It might

12   appear that I was telling my son to go on the network and

13   get that information from CCA, but this is for labor wages.

14        And labor wages, because on the exhibitor revenue

15   piece, right, the majority of the exhibitor revenue comes

16   from drayage, which is shipping back and forth of the goods,

17   and exhibitors, a lot of that cost is labor costs, union

18   labor costs, for doing that work for them.

19        And they argue in their affidavits that such labor

20   rates are not confidential because you can get them from the

21   union yourself.

22        I have two response to that your Honor.  Number one,

23   even if you can get individual information from certain

24   labor unions as to this, you're not going to have it all in

25   one program ready to go.

PDF created with pdfFactory trial version www.pdffactory.com

1          And, as your Honor knows, there's a spectrum of things

2     between trade secret and proprietary information.  And if

3     something is not a trade secret, it could be still protected

4     as proprietary because a company or employer has spent

5     hours, many hours, people hours, time and expense, in order

6     to compile that information.  And to steal that info -- take

7     that information unlawfully, is unfair competition.

8          THE COURT:  No.

9          Although I had that same issue years ago in the Babcock

10    Wilcox case.  But the First Circuit ultimately approved my

11    jury instruction in that case.  You do have to show certain

12    steps were taken to actually turn something into truly

13    protected proprietary information.

14          MR. WINTON:  Understood, your Honor.

15          THE COURT:  And that usually is an issue of fact.

16          MR. WINTON:  And, your Honor, we -- I think based

17    on what the CCA program is and the way they dealt with it,

18    that's exactly what it is.

19          In fact, the other argument I was going to make is that

20    if this information was so easily accessible, then why did

21    they need to get it from us?

22          And that's sort of the overall overarching response to

23    much of what they say in their affidavits:  This is not

24    confidential.  We didn't need it.

25          Then why did you take our entire company, put it on a

1    disk, and throw it over to your computer system?

2          I mean, when we first found out that they were

3    accessing through Citrix, we thought that was all they had

4    done.  And then when we were given their computer system for

5    forensic review, we learned the extent of the information

6    they had.  They basically took our entire company and put it

7    on their hard drives and in their emails and just blatantly

8    used such information, your Honor.

9          So that's with respect to Yankee Dental to show you

10   that there are trade secrets, there is confidential

11   information, it is being used.  It has been used by them.

12   It's currently being used because that's the outstanding bid

13   that's before Yankee Dental.

14         And, your Honor, they also used Susan Dos Reis, who had

15   a relationship with Yankee Dental on behalf of Champion.

16   They used her in a breach of duty of loyalty to solicit

17   Yankee Dental on their behalf while she's still working for

18   our client, obviously an unlawful activity, and also

19   something that should not be condoned by the Court.  And

20   that's why we're seeking injunctive relief as to Yankee

21   Dental, your Honor, only for a 90-day time period, a very

22   small time period, because of the use of information, the

23   breach of the duty of loyalty, which all falls under a

24   Chapter 93A violation for unfair and deceptive business

25   practices, your Honor, which allows for injunctive relief.

1        As to the other customer, NAA, we're seeking -- in that

2   case we are seeking a restriction through the end of the

3   contract, which is October 2012.  Essentially we're seeking

4   a restraining order regarding the interference with that

5   contract, your Honor.  And the basis for that is, once

6   again, they did use Champion's confidential information to

7   prepare that bid.

8        And the evidence of that, your Honor, can be found,

9   amongst other places, in Exhibit 17.

10       (Pause in proceedings.)

11           MR. WINTON:  Do you have Exhibit 17?

12           THE COURT:  Yes.

13           MR. WINTON:  So Exhibit 17 is an email exchange

14  between John Szymczak, who is a former vice president and

15  executive of Champion, and Mark Epstein shortly after -- two

16  or three days after he left Champion.

17       And if you move down to the email on October 29, 2010,

18  at 5:09, it says, "Doug, I wanted to let you know that Anita

19  and myself resigned from Champion yesterday."

20       It goes on to say in the next line, "I had lunch with

21  your staff today and gave them a proposal and explained how

22  we feel, that we've created a perfect vehicle to execute

23  great service."

24       And later on in that paragraph at the very end in

25  parentheses is says, "Our goal" -- it says, "And we reduced

1   the invoice by 50 percent."

2       So that tells us a couple of things, your Honor, in

3   this email that should be of interest to the Court.  Number

4   one, it proves that Mr. Szymczak was, and we have other

5   evidence here as well, that he was working on Nexxt's

6   behalf, while an executive of Champion, working on Nexxt's

7   behalf in order to take the NAA contract away.

8       And he was very familiar with the NAA contract.  He had

9   worked with them.  He knows that contract.  He knew the

10  contract existed and, therefore, his knowledge of trying to

11  interfere with that contract is -- the knowledge goes to an

12  interference claim, your Honor.

13      He also met with them the day of or the day after he

14  resigned with a full prepared bid or proposal in hand.  So

15  he set up that meeting before he left, and he prepared that

16  bid with Nexxt while still working for Champion as an

17  executive, prepared that bid so it would be ready to go as

18  soon as he walked out the door.

19      And perhaps most disturbing is the reference to

20  reducing the invoice by 50 percent.  The only reason he knew

21  what the invoice was for the show management fee -- which,

22  by the way, is confidential, your Honor, what you charge the

23  trade association -- the only reason he knew that is from

24  his work with Champion.  And he then used that information

25  to underbid them, which is clear use of confidential

PDF created with pdfFactory trial version www.pdffactory.com

1   information in order to interfere with this contract and

2   prepare a bid.

3        And, your Honor, it didn't end there.

4        If you look at Exhibit 18, again with respect to

5   Mr. Szymczak and his attempts to interfere with the pending

6   current contract between my client and NAA, he writes a

7   letter in Exhibit 18 where he says --

8        I'm sorry.  I'll give you a chance to get to 18.

9             THE COURT:  I've got it.

10            MR. WINTON:  He says, "I spoke with our attorney

11   who recommended that you sent Bob" -- who is the CEO of

12   Champion -- "a letter of termination similar to the one

13   below.  He also felt you should sever your ties sooner

14   rather than later."  So here he is encouraging them to

15   breach their contract and break their contract with Champion

16   and actually giving them a draft termination letter.

17        And later on in this email it says, "Nexxt Show is

18   prepared to indemnify and hold harmless NAA for any

19   potential legal action Champion may send you" -- "any

20   potential legal."

21        It says, You will have our attorney at your disposal at

22   no charge to the association.  Meaning if Champion sues you

23   for breach of that contract, we'll indemnify you.

24        So not only does Mr. Szymczak solicit NAA on behalf of

25   Nexxt while working for Champion, not only does he prepare a

1    bid using our confidential information, but he's now going

2    full speed ahead in order to try to interfere with this

3    relationship and offering indemnity, offering the 50 percent

4    off, and actually giving them a letter of termination

5        So, your Honor, we're just asking that they not be

6    permitted to interfere with the relationship with this

7    entity which we have through 2012.  And it's, for the most

8    part, based on the interference claim, the breach of duty of

9    loyalty claim, and they all fall into Chapter 93A, unfair

10   business practices.

11       Your Honor, in terms of the intentional interference

12   and the element of the improper motive that we would

13   require, that's proven in Exhibit 14 where Mark Epstein

14   writes to John Szymczak about the NAA show, "This June

15   show" -- meaning if he gets the June show.  "This June show

16   will put Bob" -- the CEO of Champion -- "over the edge with

17   the other business they lost.  You just might sink Champion

18   on this one."

19       So it's not enough that they want to take certain

20   clients.  They want to actually sink the company.  They want

21   to try to put them out of business.  And that's their intent

22   and that's the improper motive, your Honor, all while using

23   our confidential information.

24       Your Honor, to the extent we are speaking of opposing

25   counsel's arguing that there is no irreparable injury in

PDF created with pdfFactory trial version www.pdffactory.com

1    this case, we would submit that it's not just about losing

2    revenue from these customers, if we were to lose them,

3    because the way it works is that profit margin gets better

4    as time goes by and you have the advantage of a long-term

5    customer, that you do the show more efficiently every year.

6        So this would -- this would essentially, you know, take

7    more than just money damages to address the harm that could

8    be -- that could be affected by what they would do.

9        In addition, your Honor, the case law is clear that

10   loss of trade secrets and confidential information is

11   irreparable harm.

12       And here what's different about this case is that the

13   evidence is not being disputed.  The bad acts that have been

14   alleged have not been denied, and the result of the blatant

15   activity of the defendants, they can't be trusted; and for

16   that reason, the use of confidential information, the fact

17   that they can't be trusted and the fact that we believe

18   they're already violating the Court order by using that

19   information to go with the bids that are currently pending,

20   we seek this injunctive relief, your Honor.

21       To the extent that counsel wants to have expedited

22   discovery and a full preliminary injunction hearing, we

23   would be willing to engage in that as long as the -- your

24   Honor would grant the restraining order pending that PI

25   hearing.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  The case has now shifted from

 2    Judge Young to Judge Gorton to me.  I gather you anticipate,

 3    which I do not mind doing, that I will keep jurisdiction at

 4    least over the injunctive phase?

 5              MR. WINTON:  I think that makes sense, your Honor.

 6              THE COURT:  It would seem to make sense, rather

 7    than trying to get yet a fourth judge involved.

 8              MR. WINTON:  We've already gone through half the

 9    panel.  So that probably makes sense.

10              THE COURT:  Okay, good.

11              MR. WINTON:  Thank you, your Honor.

12              MR. CONNOLLY:  Good afternoon, your Honor.

13              THE COURT:  Mr. Connolly.

14         (Pause in proceedings.)

15              MR. CONNOLLY:  I didn't know if the Court was going

16    to ask a question.

17              THE COURT:  No.  I was just getting myself oriented

18    now that I'm shifting gears.

19              MR. CONNOLLY:  Let me begin, your Honor, by

20    agreeing with my brother, Mr. Winton, as to his point that

21    this is a case where it's appropriate for the Court to enter

22    an junction.  In fact, when I first got involved in this

23    case, it took me very little time to agree with that

24    proposition, which is why there was a stipulated injunction

25    entered, I believe it was at the end of December or early
```

PDF created with pdfFactory trial version www.pdffactory.com

1    January; and that was based upon the evidence which,

2    frankly, is compelling about an unauthorized entrance into

3    an online data storage site.

4        Being confronted with that evidence, we agreed not only

5    that that ought to be enjoined from ever occurring again,

6    but that Nexxt Show and its agents and so forth ought to be

7    enjoined from ever using that information.  And that is

8    something that we agreed to, which has been entered by this

9    Court.  And actually, your Honor, it protects Champion in

10   every material respect as to every argument that's raised in

11   furtherance of this motion.  There is no further injunctive

12   relief required to protect the legitimate interests as to

13   misappropriated confidential business information.

14       What we have a dispute with on this motion, first and

15   foremost, your Honor, is that it was served upon counsel

16   after 4 p.m. yesterday.  We have had less than 24 hours to,

17   if the plaintiff were to have its way, litigate the entire

18   case.  The voluminous materials annexed to the motion for a

19   TRO were not available to counsel until, effectively, after

20   the close of business last evening; yet Champion is asking

21   this Court to enter an order that would irretrievably strip

22   Nexxt Show of its ability to bid for these upcoming shows.

23   There is no immediate need for it, your Honor, and there is

24   no irreparable harm that would flow to Champion if the Court

25   were to do what your Honor suggested, which is to impose a

PDF created with pdfFactory trial version www.pdffactory.com

1  schedule of expedited discovery and an evidentiary hearing,

2  be that before the Court or a jury.  We don't have an issue

3  with either way.  We're all for that.  And I think that can

4  be accomplished in 30 days, as the Court suggested, and

5  we're fully in support of that.

6       And in light of that, your Honor, I am reluctant to go

7  into the merits of the case because the many factual

8  arguments that had been raised by Mr. Winton, who's

9  obviously had a month or more to reflect on this, poring

10  over the data that's been reviewed, are, to a single item,

11  highly questionable as to whether they amount to a trade

12  secret, or truly confidential business information, or

13  information that has anything to do with the two future

14  pieces of business which are sought to be precluded by an

15  injunction.

16       For example, your Honor, Mr. Winton said that access

17  has been gained through this Citrix server, and revenue and

18  expense information has been obtained by Nexxt Show

19  employees.  The forensic evidence appears to show that

20  that's the case.  And, in fact, we've admitted that that's

21  the case, your Honor.

22       But that information is not the information that has

23  been submitted to Yankee Dental or to National Apartment

24  Association.  We haven't had access to Champion's bid

25  information, its proposal against which we are now intending

1    to compete.   That information would be far more relevant as

2    to whether there is an unfair advantage, as compared to

3    historic information, and let me explain why that's the

4    case, your Honor.

5        These shows differ from year to year.   These show -- in

6    fact, if the Court were to go on to the websites of the

7    leading competitors in this industry, the Court would see

8    that companies such as Champion and Freeman and GES, the

9    "Big Three" in this industry, pride themselves at responding

10   to an ever-changing industry.   And the -- even the very

11   documents which Mr. Winton attached to his motion involving

12   emails and letters from Mr. Epstein, acknowledge that, Every

13   year we have to change.   Every year we have to catch up with

14   the new trends.   There's new designs.   There's new

15   technology.   And so what happened last year is not what will

16   happen next year.

17       In fact, it's interesting that more than one Nexxt Show

18   employee has remarked to me, We're not people who follow a

19   formula, like producing Coke.   We're wedding planners.   We

20   do something that is inventive and creative and unique each

21   and every year, and along with that comes new and different

22   design expenses, creativity expenses, things that are unique

23   to Nexxt Show, unique to Champion, and unique to all the

24   competitors.

25       Whatever it is that Champion has submitted to Yankee

```
 1    Dental for the 2012 show as to which Champion seeks an
 2    injunction, we have no idea what they've submitted.  We
 3    don't have access to it.  It hasn't been provided to us by
 4    any former Champion employee, by Yankee Dental, or anybody
 5    else.  And that's what we're competing against a year from
 6    now.
 7         Your Honor, at a minimum, the Court ought to allow for
 8    discovery so that we can drill down and see whether there's
 9    even a shred of information that is pertinent to the two
10    prospective pieces of business as to which Champion seeks an
11    injunction.
12         Now, when the Court focused Mr. Winton on just what is
13    it that involves a trade secret here, Mr. Winton identified
14    two pieces of information, and I submit his answer
15    underscores the need for discovery and a hearing before any
16    further injunctive relief is entered.
17         Mr. Winton said, Exhibitor revenue, your Honor, we need
18    to get an injunction here because as a result of Matthew
19    Epstein getting access to the Citrix online storage base,
20    they now have our exhibitor revenue.
21         Well, your Honor, exhibitor revenue is a bold number in
22    each case.  There is evidence in the affidavits that are
23    before the Court that are in nature of 850,000 a year, and
24    those are numbers that are not trade secrets.  They're not
25    what the law recognizes as protectable information, because
```

PDF created with pdfFactory trial version www.pdffactory.com

1  everybody who works on that account knows it.  It is the

2  kind of information, your Honor, that there are -- any

3  number of legal decisions acknowledge cannot constitute

4  trade secret information because it's the information that

5  one walks out of one's employer's office and into another

6  employer's office with in one's head.  It's like if a lawyer

7  who leaves Firm A and knows that Firm A's senior partners

8  charge $500 an hour, that lawyer knows he can go to Firm B

9  and undercut Firm A by charging $450.  That's not a trade

10  secret.  That's the kind of information that the law doesn't

11  want to go near, barring people from using in its subsequent

12  employment, because if the law did that, people couldn't get

13  other jobs in the same industry.  They'd have to change

14  their industry every time they got a new job.

15      The information that's involved here, your Honor, is,

16  for the most part, public information.  Ninety or more

17  percent of the revenue that's generated by the Yankee Dental

18  show or the National Apartment Association show is public.

19      The Court today at this moment could go onto

20  championexposition.com and put in "Student Housing," which

21  is an NAA show that will take place at the end of February

22  in Las Vegas, and the Court will see a full catalogue of

23  pricing for that show.  Any member of public can access it.

24      Now, Mr. Winton says, But it's the gross profit that is

25  so important to know here and the gross revenue.

PDF created with pdfFactory trial version www.pdffactory.com

1            Well, that information is in the head of the people

2      who've run that show for years.  In fact, in preparing for

3      this hearing today, I mentioned some shows offhandedly to

4      Mr. Szymczak, who is sitting in the courtroom, and without

5      looking as any paper, he said, right off the top of his head

6      almost to the penny, the revenue generated by those shows,

7      because these are big-dollar events, your Honor.  They're

8      very important to people like Mr. Szymczak, and he knows

9      that for the past ten years the National Apartment

10     Association show generates X dollars in revenue.

11          He also knows what the proximate tonnage moved is, or

12     the drayage, and that is a number from which, if you've got

13     Mr. Szymczak's experience, you can extrapolate what the

14     costs are.  This isn't something that's kept under lock and

15     key and you can only know it if you read the documents.

16          The labor rates multiplied by the tonnage tells you the

17     expenses.  It's an absolutely elementary formula that would

18     allow anybody in the position of Mr. Szymczak to tell the

19     Court what the expenses are without looking at anything.

20          Now, I don't want to debate the merits today, your

21     Honor, about whether this is truly trade secret information,

22     but I would urge the Court not to enter an injunction which

23     will irreparably damage my client, because we'll loose this

24     business if these bids are awarded to somebody else as a

25     result of this Court's injunction.  I respectfully submit

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    the Court should allow for discovery to occur and on an
 2    expedited basis, and there will be no harm to Champion;
 3    because if this Court enters an order on April 1 that Nexxt
 4    Show is enjoined from performing any National Apartment
 5    Association shows or Yankee Dental shows, that will be it.
 6    We will be out of the running.  But at least we will have
 7    had due process.  At least we will have had discovery, an
 8    opportunity to ask Champion witnesses whether they believe
 9    these arguments have any merit.  And I have a strong belief
10    that they're going to disagree with their counsel when
11    confronted with these allegations that this is truly
12    important information in terms of getting the bids.
13         Just to address that point further, your Honor,
14    Mr. Epstein, the man who started Champion and who has now
15    started Nexxt Show, knows the secret to success in this
16    business.  And the secret to success is much like a
17    successful law firm.  You bring in good people who provide
18    good service, and what results from that is repeat business
19    because these shows occur in a concentrated period of time.
20    The sponsors of these shows require meticulous attention to
21    detail, responsive service from people like Mr. Szymczak,
22    and once they know they're going to get it, they stay with
23    these people.
24         Your Honor, I submit that the reason that Champion has
25    moved for a TRO, a final adjudication on the merits as to
```

PDF created with pdfFactory trial version www.pdffactory.com

1  these two shows in less than a 24-hour period for us to

2  respond, is because they don't want us to have an

3  opportunity for discovery, because these arguments will not

4  hold up if we have a full opportunity to do discovery and to

5  ask their witnesses, and Yankee Dental witnesses, and

6  National Apartment Association witnesses, whether they agree

7  with these arguments.  I believe those arguments will be

8  dissolved quickly if we're given that opportunity, and,

9  whether I'm right or I'm wrong, we should have an

10  opportunity to take that discovery.

11      So I respectfully submit, your Honor, that the Court

12  should deny the motion for a TRO, leave in place the

13  injunctive relief which legitimately protects the

14  information as to which Nexxt Show has obtained improper

15  access, that will protect Champion as much as it needs to be

16  protected until we can adjudicate this motion in a 30- or

17  40-day period.

18      Thank you, your Honor.

19          THE COURT:  Thank you.

20      All right.  Here is what I am going to do.

21      I am quite familiar, obviously, with the standard that

22  one applies in an injunctive context, whether it be a

23  restraining order or preliminary injunction.

24      I am always sympathetic to due process arguments, and

25  as quickly as I think I can do things, I can understand that

PDF created with pdfFactory trial version www.pdffactory.com

```
1    24 hours is a difficult time to respond to almost anything,

2    particularly something of this complexity.

3        In terms, however, of the framework of what I see at

4    the moment on the merits, certainly on the Computer Fraud

5    and Abuse Act, I think we all could almost agree today that

6    plaintiffs prevail.

7        Trade secrets, I am not in doubt, it is just that I do

8    not have enough information because what turns confidential

9    information -- you can have confidential information that is

10   protected, even though it is not technically a trade secret.

11   But, then again, that depends on what a company has done

12   internally to safeguard it, and that is an issue of fact

13   that I am not in a position to answer today.

14       Also, as you recall, under the Restatement of Unfair

15   Competition, injunctive relief is not really that favored in

16   the trade secret context, as opposed to others, but that is

17   neither here nor there.

18       I do think as of this moment -- but, again, I think

19   Mr. Connolly makes the point that he has not been able to

20   fully develop a record for his client -- that a showing of

21   irreparable harm with respect to the Yankee Dental matter

22   has been shown, and here I am relying principally on Exhibit

23   19 and Exhibit 20, the emails that I was shown.

24       What I am going to do, and I am going to leave it to

25   counsel to work out how this is going to be proceed, is I am
```

1    going to allow the temporary restraining order as to Yankee

2    Dental, not as to National Apartment Association.

3        I am going to authorize discovery focused on the Yankee

4    Dental contract, and I am going to authorize you to begin

5    immediately.  And, as it happens, I can see you for an

6    evidentiary hearing at 10:00 next Friday.

7        That will give you sufficient time on both sides to

8    fully prepare that issue, as to whether I should continue in

9    place the injunctive order as requested with respect to

10   Yankee Dental.

11       With respect to the National Apartment Association, we

12   can let that happen as it evolves.  I do not see anything

13   that is imminently required from the Court with respect to

14   that, and I know that there are limits of how much one can

15   do even in a week.

16       I realize this ruins many associates' long weekend, and

17   I'm sorry for that; but I think it is important to your

18   clients that we resolve at least this first pending matter,

19   which seems to me is the Yankee Dental matter, as quickly as

20   we can.

21       So the TRO is granted and will continue until next

22   Friday pending an evidentiary hearing by the Court to

23   convene in this courtroom at 10 a.m., Friday, the 25th of

24   February.

25       All right.  Thank you, counsel, for this spirited

1    argument.

2              MR. WINTON:  Thank, your Honor.

3              MR. CONNOLLY:  Thank you, your Honor.

4              THE CLERK:  All rise.

5         (Proceedings adjourned.)

6

7                     **C E R T I F I C A T E**

8

9         I, James P. Gibbons, Official Court Reporter for the

10   United States District Court for the District of

11   Massachusetts, do hereby certify that the foregoing pages

12   are a true and accurate transcription of my shorthand notes

13   taken in the aforementioned matter to the best of my skill

14   and ability.

15   /s/James P. Gibbons                    February 24, 2010

16

17   _____

18   James P. Gibbons

19

20                 JAMES P. GIBBONS, CSR, RPR, RMR
                      Official Court Reporter
21                  1 Courthouse Way, Suite 7205
                    Boston, Massachusetts 02210
22                     jmsgibbons@yahoo.com

23

24

25