# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CHAMPION EXPOSITION SERVICES LLC;
WCP EXPOSITION SERVICES OPERATING
COMPANY LLC; and
WCP EXPOSITION SERVICES HOLDING
COMPANY LLC,

                    Plaintiffs,

v.

NEXXT SHOW, LLC; MARK EPSTEIN;
MATTHEW EPSTEIN, JOHN SZYMCZAK;
SUSAN DOS REIS; SHERI RYDER; ANITA
BOTA; MICHAEL HALL; VICKY BASSETT;
and NICOLE PREFONTAINE,

                    Defendants.

Civil Action No. 10-cv-12228-WGY

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
## MOTION FOR CONTEMPT FOR VIOLATIONS OF THE STIPULTED INJUNCTION
## (LEAVE TO FILE GRANTED FEBRUARY 28, 2012)

Plaintiffs[1] offer this reply ("Reply") in response to Defendants' Opposition to Plaintiffs'

Motion for Contempt for violations of the Stipulated Injunction endorsed and entered by this

Court on June 2, 2011 ("Stipulated Injunction") (Docket No. 87).[2]

---

[1] Plaintiffs merged (the "Merger") into Freeman Decorating Services, Inc. ("Freeman"), effective January 1, 2012. By the terms of the Merger, Freeman succeeded to Champion's rights relating to the Stipulated Injunction. See Affidavit of Dawnn Repp in Support of Plaintiffs' Reply to Defendants' Opposition to Motion for Contempt, ¶ 3.

[2] The suggestion that this Court lacks jurisdiction over the Motion for Contempt is yet another attempt by Contempt Defendants to avoid an obligation to which they unambiguously committed. The parties' settlement agreement plainly states that that they intend the Court to "maintain jurisdiction over the[m] with respect to the restrictions set forth in the Stipulated Injunction, for the duration of the Restricted Period." See Affidavit of Erik J. Winton ("Winton Aff."), ¶ 3. Moreover, when counsel for all parties were in the Court's chambers shortly before settlement of the case, the Court specifically indicated its intent to retain jurisdiction over the case regarding any post-settlement restrictions. See id., ¶ 4. Further still, Plaintiffs' counsel called the Court's docket and courtroom clerks prior to filing Plaintiffs' Motion for Contempt in order to seek confirmation regarding the appropriate presentation

## I.     INTRODUCTION

In their opposition Contempt Defendants offer only irrelevant and misleading argument that in no way weakens Plaintiffs' requests for relief as stated in their Motion for Contempt. Plaintiffs' motion should be granted because:

- The November Solicitation was a direct, personalized solicitation, not an indirect, generalized advertisement.  It was sent by e-mail directly to the restricted entity, and the fact that Contempt Defendants hired a third-party vendor to send the solicitation did not render it any less of a violation of the Stipulated Injunction, which bars both direct and *indirect* solicitation of Champion Events.

- Champion was not advised prior to April 21, 2011 that it was not producing the 2012 California Charter School Association ("CCSA") event; therefore, the event remained a Champion Event, as clearly defined by the Stipulated Injunction.

- The Stipulated Damages provision was endorsed by this Court, and Contempt Defendants are thus barred from challenging it as an impermissible penalty.  Moreover, Contempt Defendants fail to overcome the presumptive enforceability of stipulated damages provisions entered into, as here, by commercial entities.

Accordingly, Plaintiffs Motion for Contempt should be granted in its entirety.

## II.    ARGUMENT

### A.     The November Solicitation Was A Personalized Solicitation Sent To At Least One Champion Event, And It Violated The Stipulated Injunction Even If It Was "Indirect."

Defendants' argument that the November Solicitation was a generalized, indirect advertisement—and that, as such, it did not violate the Stipulated Injunction—is both factually and legally incorrect.  Although Contempt Defendants argue that "Nexxt simply made a general announcement, to the industry as a whole, introducing [Nexxt]," such that the "fact that one or more of Plaintiffs' customers may have seen the announcement hardly constitutes the kind of

---

of the Motion for Contempt, and counsel was advised to file the motion in this case (rather than file a new matter). See id., ¶ 5.

direct solicitation that the injunction prohibited," this characterization does not comport with reality.

The November Solicitation was not an advertisement posted to a public space; rather, it consisted of personalized e-mail solicitations sent to individual e-mail accounts of potential customers. To send such solicitations, Contempt Defendants used a service offered by Expo Magazine ("Expo"). See Affidavit of Matthew Epstein in Support of Defendants' Opposition, ¶ 14. By their own admission, Defendants specifically used Expo to "blast" a high volume of e-mail messages to thousands of recipients in their industry, without first investigating whether individuals associated with Champion Events would receive such messages. See id.[3]

On behalf of Defendants, Expo's service "personalized" such e-mail messages by inserting the name of each message-recipient in them. The e-mail messages solicited the business of the recipients, stating that Nexxt Show would be "the architects of *your* next show." See Exhibit 1 to the Affidavit of Richard McClellan in Support of Plaintiffs' Motion for Contempt ("McClellan Aff.") (emphasis in original). Moreover, the messages contained multiple uses of the word "champion." The subject-lines stated, "Who's YOUR Champion," and a headline within the messages stated, "Looking for a champion? You found it in NexxtShow!" See McClellan Aff., Exhibit 1. These references appear to have been intended as attempts to confuse recipients of the solicitations as to the solicitations' source. For Contempt Defendants to suggest now that the solicitations were "general" and directed at "the industry as a whole," such

---

[3] Expo's website (www.expoweb.com), referring to the practice of e-mail blasting ("e-mail campaign[ing]"), boasts of such campaigns' ability to contact potential customers by e-mail, noting "[I]t's still e-mail—accessed on a personal computer, laptop or mobile device—that drives communication." See http://www.expoweb.com/article/cheat-sheet-e-mail-marketing-attendees (last visited March 1, 2012). The website urges its customers, such as Contempt Defendants, to "[p]ersonalize. Don't send generic e-mails. Be sure each is personalized with the recipient's name." Id. Finally, Expo urges its customers to use "SUBJECT AND HEADLINE HINTS." Id.

that Contempt Defendants cannot be responsible if "Plaintiffs' customers may have seen the announcement," strains credulity. This is not the service for which Contempt Defendants paid Expo, nor is it what Contempt Defendants received.

Nor is it significant that Contempt Defendants used a third-party vendor to send the November Solicitation. The Stipulated Injunction bars indirect solicitation just as it bars direct solicitation, as it states, in relevant part that Defendants "will not directly **or indirect** solicit or provide any services of any type to or in connection with any "Champion Event." See Exhibit 1 to the Motion for Contempt, ¶ 1. Therefore, the November Solicitation constitutes a violation of the Stipulated Injunction, for which Contempt Defendants should be found in contempt.

### B.   CCSA Remained A "Champion Event" Even If Plaintiffs "Had No Further Right To Produce The CCSA Event" After They Produced The 2011 Show.

The controlling language of the Stipulated Injunction is unambiguous. It defines a "Champion Event" as:

> a specific trade show, exposition or other similar event which, when it most recently occurred (provided such event occurred within the three (3) years prior to April 21, 2011), was produced by Champion Exposition Services LLC . . . , provided, however, that a 'Champion Event' shall not include a trade show, exposition or other similar event if prior to April 21, 2011, Champion was advised that it would no longer be producing the event.

Given this definition, the fact that an event, such as CCSA, may have had a one-year contract that terminated upon completion of the event is of absolutely no moment. In order for an event that was produced by Champion when it most recently occurred not to be a Champion Event, it was necessary for Champion "to [have] be[en] advised [prior to April 21, 2011] that it would no longer be producing the event." Contempt Defendants do not dispute—nor could they dispute— that Champion received no such notice from CCSA. Contempt Defendants offer no evidence that Plaintiffs had been so informed, nor have they provided any evidence showing that they

made any inquiry whatsoever into that crucial question. They only state that they did not <u>believe</u> CCSA was a Champion Event because Defendants had been asked to bid on the 2012 CCSA event. Of course, Plaintiffs also bid on the CCSA event, further demonstrating that they had not been told prior to April 21, 2011 that they would no longer be producing the event. Accordingly, when Nexxt Show solicited and contracted with CCSA to produce its 2012 event, Nexxt Show did so in violation of the Stipulated Injunction.

        **C.**      **The Court Has Already Approved The Stipulated Injunction, Including The Stipulated Damages Provision To Which Defendants Agreed, And Defendants Cannot Overcome The Presumption That Such Provision Is Enforceable Nor Satisfy Their Burden Of Showing That The Agreement Constitutes An Impermissible Penalty.**

              **1.**      **The Court approved the Stipulated Damages provision when it endorsed the Stipulated Injunction as its own order; Contempt Defendants are estopped from now arguing that the provision constitutes an impermissible penalty.**

Pursuant to their Settlement Agreement, the parties jointly asked the Court to endorse the Stipulated Injunction, in order the give the injunction the force of a court order. <u>See</u> Docket No. 86 (styled as a "*Joint* Motion" and reciting that Stipulated Injunction is "[b]ased upon the agreement of the parties"). The Court subsequently endorsed the Stipulated Injunction without altering the document. <u>See</u> Docket No. 87. Defendants, not surprisingly, did not move for reconsideration of the Stipulated Injunction, which they themselves asked the Court to endorse. The Stipulated Injunction—including the Stipulated Damages provision—should not now be revisited. <u>See, e.g.</u>, <u>Atl. Research Mktg. Sys. v. G. G. & G., L.L.C.</u>, 167 F. Supp. 2d 458, 466 (D. Mass. 2001) (Keeton, J.) (noting provisions alleged to constitute unenforceable punitive liquidated damages were "in the [parties'] [s]ettlement [a]greement and the [j]udgment based on [the settlement agreement]," that those provisions had been "approved by Judge Young," and that the court was obliged therefore to "treat them as valid and enforceable"). Defendants should

not now be heard to argue that the Stipulated Damages provision to which they agreed—and which the

Court approved—constitutes an impermissible penalty.

>    **2.      Contempt Defendants cannot overcome the presumption that the
>            Stipulated Damages provision is enforceable, nor can they satisfy their
>            burden of showing that the provision constitutes an impermissible
>            penalty.**

Massachusetts courts rule consistently with the general trend favoring enforcement of

stipulated damages provisions.  For example, the Supreme Judicial Court, in a recent decision in

which it enforced such a provision, pronounced:

> We agree that "[t]he rule against penalty clauses . . . has come to seem rather an
> anachronism, especially in cases in which commercial enterprises are on both
> sides of the contract."  XCO Int'l, Inc.[v. Pacific Scientific Co., 369 F.3d 998,
> 1002 (7th Cir. 2004)].  See id. at 1002-1003 (collecting cases); American Multi-
> Cinema, Inc. v. Southroads, LLC, 119 F. Supp. 2d 1190, 1206-1207 (D. Kan.
> 2000), and cases cited; JMD Holding Corp. v. Congress Fin. Corp., 4 N.Y.3d 373,
> 380-381, 828 N.E.2d 604, 795 N.Y.S.2d 502 (2005).  See also 3 E.A. Farnsworth,
> Contracts § 12.18, at 303-304 (3d ed. 2004) (Farnsworth) ("trend favors freedom
> of contract through the enforcement of stipulated damage provisions as long as
> they do not clearly disregard the principle of compensation"); Williston
> [Contracts § 65.27, at 339 (4th ed. 2002)] ("An agreement for a fixed amount of
> damages for failure to carry out . . . a property lease will generally be treated  as
> an enforceable liquidated-damages provision, under the rules generally applicable
> to determining the validity of such provisions"); Restatement (Second) of
> Contracts § 356 comment a, at 157 (1981) ("parties to a contract may effectively
> provide in advance the damages that are to be payable in the event of breach as
> long as the provision does not disregard the principle of compensation").

Cummings Props., LLC v. Nat'l Communs. Corp., 449 Mass. 490, 495 (2007) (emphasis

supplied and certain citations altered from short to full form).  Moreover, the Massachusetts

Supreme Judicial Court has affirmed that stipulated damages provisions are presumptively

enforceable and that the party challenging the validity of such a provision bears the burden of

demonstrating its unenforceability.  In TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422,

430-431 (2006), the Court noted:

> Under freedom of contract principles, generally, parties are held to the express
> terms of their contract, and the burden of proof is on the party seeking to

invalidate an express term.  <u>The burden of proof regarding the enforceability of a liquidated damages clause, therefore, should rest squarely on the party seeking to set it aside.</u> . . .  Any reasonable doubt as to whether a provision constitutes a penalty or a legitimate liquidated damages clause should be resolved in favor of the aggrieved party.

(emphasis supplied and internal citations omitted).  As the party challenging the validity of the Stipulated Damages provision, Contempt Defendants bear the burden of proving that the provision is unenforceable, and the presumption is that the provision is enforceable.

Faced with a negative legal presumption *and* the evidentiary burden, Contempt Defendants offer only the slightest evidentiary support for their strained position, in the form of an affidavit from Nexxt Show's president Matt Epstein.  On the subject of the Stipulated Damages figure, Epstein suggests that, as far as he can "recall" from the parties' mediation and settlement negotiations, it was "pulled from thin air" and was "to [him] a totally arbitrary number . . . meant solely to penalize Nexxt [Show] in the event of a violation [of the Stipulated Injunction]."

These self-serving and conclusory allegations, however, are belied by the reality of the context in which the Stipulated Damages provision—and the balance of the parties' Stipulated Injunction and settlement agreement—was negotiated.  Both parties are, and were, sophisticated "commercial enterprises," <u>Cummings Props.</u>, 449 Mass. at 495, and they were both vigorously represented by experienced and competent counsel.  As it happened, during the negotiation of the terms of the Stipulated Injunction, <u>Defendants themselves</u> proposed the Stipulated Damages figure as part of a more general effort to narrow the definition of "Champion Event" (and thereby broaden the market in which they could compete).  <u>See</u> Winton Aff., ¶ 6.  Plaintiffs had advocated for a broader definition of Champion Event, which would have extended to more of Plaintiffs' customers than did the eventual definition.  <u>See</u> <u>id.</u>  Thus, it was in exchange for the

operative, narrower definition of Champion Event that Defendants offered the $250,000 Stipulated Damages figure.  See id.  Under the above-cited, well-established Massachusetts law, the Stipulated Damages provision is, thus, enforceable.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

(i)      rule that Contempt Defendants are in contempt of the Stipulated Injunction;

(ii)     order that Contempt Defendants, pursuant to the terms of the Stipulated Injunction, must pay the agreed stipulated damages amount of $250,000 for each violation of the Stipulated Injunction;

(iii)    order that Plaintiffs may conduct limited, expedited discovery to determine the full extent of the violations of Stipulated Injunction;

(iv)     order that Nexxt must immediately produce to Plaintiffs a list of each and every recipient of the November Solicitation;

(v)      order that Nexxt pay Plaintiffs' attorneys' fees and costs associated with their breaches of the Stipulated Injunction, including but not limited to those related to this motion; and

(vi)     order such other relief as the Court deems just.

Respectfully Submitted,

CHAMPION EXPOSITION SERVICES LLC,
WCP EXPOSITION SERVICES OPERATING
COMPANY LLC, and WCP EXPOSITION
SERVICES HOLDING COMPANY LLC,

By their attorneys,

/s/ Brian M. Childs
Erik J. Winton, BBO No. 600743
wintone@jacksonlewis.com
Brian M. Childs, BBO No. 662594
brian.childs@jacksonlewis.com
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated:  March 5, 2012

## CERTIFICATE OF SERVICE

This hereby certifies that on this fifth day of March, 2012, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to any indicated as non-registered participants.

/s/ Brian M. Childs
Jackson Lewis LLP

4852-4217-2430, v. 5