```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 10-12228-WGY

 4
      * * * * * * * * * * * * * * * * * *
 5    CHAMPION EXPOSITION SERVICES LLC,    *
      WCP EXPOSITION SERVICES              *
 6    OPERATING COMPANY LLC; and WCP       *
      EXPOSITION SERVICES HOLDING          *
 7    COMPANY LLC,                         *
                                           *
 8              Plaintiffs,                *
                                           *
 9    v.                                   *   MOTION HEARING
                                           *
10    NEXXT SHOW, LLC; MARK EPSTEIN;       *
      MATTHEW EPSTEIN; JOHN SZYMCZAK;      *
11    SUSAN DOS REIS; SHERI RYDER; ANITA   *
      BOTA; MICHAEL HALL; VICKY BASSETT    *
12    and NICOLE PREFONTAINE,              *
                                           *
13              Defendants.                *
                                           *
14    * * * * * * * * * * * * * * * * * *

15

                 BEFORE:  The Honorable William G. Young,
16                             District Judge

17    APPEARANCES:

18              JACKSON LEWIS LLP (By Erik J. Winton, Esq.
           and Brian M. Childs, Esq.), 75 Park Plaza, 4th
19         Floor, Boston, Massachusetts 02116, on behalf of
           the Plaintiffs
20
                SALLY & FITCH LLP & (By Kurt S. Kusiak,
21         Esq. and John Miller, Esq.), One Beacon Street,
           16th Floor, Boston, Massachusetts 02108, on behalf
22         of Defendants

23
                                          1 Courthouse Way
24                                        Boston, Massachusetts

25                                        March 27, 2012
```

1            **THE CLERK:**   All rise.   The United States District

2  Court is now in session.   You may be seated.

3            Now hearing Civil Matter 10-12228, Champion

4  Exposition Services LLC v. Nexxt Show LLC.

5            **THE COURT:**   Good afternoon.   Would counsel identify

6  themselves.

7            **MR. WINTON:**   Erik Winton for plaintiffs, your

8  Honor.

9            **MR. CHILDS:**   Brian Childs, your Honor, good

10  afternoon, also for plaintiffs.

11            **MR. KUSIAK:**   Good afternoon, your Honor.   Kurt

12  Kusiak for the defendants, and I'm here with my partner,

13  John Miller.

14            **MR. MILLER:**   Good afternoon, your Honor.

15            **THE COURT:**   Good afternoon.   I've read the papers

16  and I think I'm ready for argument.   Let's hear first from

17  the plaintiff.

18            **MR. WINTON:**   Thank you, your Honor.

19            May it please the Court, we're here today because

20  our client had no choice but to bring this issue before the

21  Court.   The defendants have violated the Stipulated

22  Injunction entered by this Court.   My client --

23            **THE COURT:**   In what specific respect?

24            **MR. WINTON:**   Two respects, your Honor.   The first

25  is the breach regarding the California Charter Schools

1    Association, or CCSA, trade show which is scheduled for

2    March, February and March of 2012.

3            The following is undisputed as to that CCSA show,

4    your Honor.  Nexxt solicited, bid for, and was awarded the

5    bid for that show for 2012.  Champion also bid for that show

6    in the fall of 2011 for the 2012 show.  Champion produced

7    the show in 2010 and 2011.  Nexxt was aware that Champion

8    produced this show in 2010 and 2011.  And Champion did not

9    receive notice as of 4-21-2011 that it would not be

10   producing the show in 2012.

11           And that's the standard, your Honor, for defining

12   what is or is not a Champion Event in the Stipulated

13   Injunction that this Court entered on June 2nd.

14   Specifically, the Stipulated Injunction states that an event

15   that Champion would have produced -- excuse me -- an event

16   which, when it most recently occurred, was produced by

17   Champion is a Champion Event and therefore restricted unless

18   that Champion, excuse me, that shall not include a trade

19   show or similar event where Champion was advised that it

20   would no longer be producing the event prior to April 21st,

21   2011.  There is no evidence before the record because it did

22   not happen.

23           THE COURT:  And the second breach?

24           MR. WINTON:  And the second breach, your Honor, is

25   the e-mail solicitation.

1          May I use this blowup to put on the easel, your

2     Honor?

3          **THE COURT:**  You may.

4          **MR. WINTON:**  This e-mail solicitation was sent out

5     October 25th, 2011.  Apparently Nexxt hired an outside

6     service to send out these e-mails to what amounts to about

7     15,000 people.  But when it's sent to these 15,000 people

8     those people don't know that it's going to 15,000 people.

9     They're sent to their e-mail.  For example, it says the

10    exact e-mail address, glapin@osteopathic.org, and it says

11    Dear Gregg.  So it's customized for that person.  And it's

12    introducing John Szymczak saying we're the architects of

13    your next show.

14          Not, your Honor, not that it's an issue with

15    respect to breach of the agreement, but it is interesting

16    that the subject line says:  Who's your champion?  And at

17    the end of this it says:  Looking for a champion?  You've

18    found it in Nexxt Show.  An attempt to try to confuse the

19    customers into thinking, hey, this guy used to be a

20    champion, you should come to Nexxt Show.  This is clearly a

21    solicitation for the business of the individuals to whom it

22    is sent.  This Mr. Lapin is also a Champion Event as defined

23    in the Stipulated Injunction.

24          Essentially defendants' argument has been that,

25    hey, we didn't send this.  The third party sent it on our

1  behalf and we didn't know where it was going.  So,

2  therefore, it can't be a solicitation and it can't be a

3  direct solicitation.  Well, the word in the Stipulated

4  Injunction restricts both direct and indirect solicitation.

5  So, whether they're having someone send it on their behalf

6  or whether they're sending it themselves, it's still a

7  violation.  And, your Honor, we don't know who else this was

8  sent to of our customers.  So, we've asked for discovery as

9  to that issue.

10         **THE COURT:**  And what is it that you want me to do?

11         **MR. WINTON:**  Your Honor, the Stipulated Injunction

12  which was entered by this Court allowed for in the event of

13  a breach that the breaching party pay stipulated damages per

14  occurrence.  That's a $250,000 per occurrence stipulated

15  damages amount.  These damages are set forth in the

16  Stipulated Injunction that was reviewed and endorsed by this

17  Court.  It's now a Court order, it carries the weight of a

18  Court order, and it cannot, it cannot and should not be

19  challenged.  In fact, the Stipulated Injunction itself when

20  it speaks to the stipulated damages amount even says in

21  paragraph 6 of the Stipulated Injunction:  The parties

22  hereby stipulate to the reasonableness of this amount.

23         This provision was agreed to by the parties at

24  mediation, part of a global settlement, and all parties were

25  represented by competent counsel.  As the recent case law

1    indicates these type of provisions are upheld, these

2    stipulated damages provisions, and it is defendants' burden

3    to show that this is an unenforceable term.

4             **THE COURT:**  All right.  What do you say?

5             **MR. KUSIAK:**  Your Honor, as to the first alleged

6    breach of the injunctive order, which is the CCSA event, my

7    brother has skipped two important facts.  He says there's

8    nothing in evidence before the Court that indicates that his

9    client was told prior to the April date set forth in the

10   injunctive order that it would no longer be producing that

11   show.  That is not true.

12            Your Honor has before you the affidavit of Robert

13   Coontz who is the executive producer for CCSA and Mr. Coontz

14   says in his affidavit briefly, as follows:  On or about

15   September 21, Champion Exposition Services entered into a

16   contract with CCSA pursuant to which it provided general

17   contractor services for a CCSA trade show.  Champion was

18   advised in such contract signed by the CCSA that the

19   contract was for that specific event only and upon

20   conclusion of that particular event (which took place before

21   April 21, 2011) Champion had no further rights to produce

22   the event.

23            So, Champion was told prior to the April date that

24   it would no longer be producing that event, exactly what is

25   required by the injunctive order.

1           You also have the affidavit of Matt Epstein, your

2     Honor, that was delivered with our papers in which

3     Mr. Epstein says that he believed according to what

4     Mr. Coontz has already said that Champion was no longer

5     producing that event.  Therefore, Judge, when they bid on

6     that event they did so believing that Champion was no longer

7     bidding on that event and that they would not be taking any

8     business opportunity away from Champion.

9           **THE COURT:**  Well, even taking it at best, what's

10    the basis for their believing that Champion would not bid on

11    that event?

12          **MR. KUSIAK:**  Because they understood from CCSA that

13    Champion was no longer doing that event ever.

14          **THE COURT:**  Well, saying that -- even if I, I give

15    the affidavit of the producer of the event all reasonable

16    inferences, and it is, look, you're doing this show and this

17    show only and it doesn't give you any rights to do any other

18    shows.  That's what the affidavit says, right?  That doesn't

19    mean they're not going to bid to do the next show the next

20    year.

21          **MR. KUSIAK:**  Our client's understanding was that it

22    doesn't matter if they bid on it or not, they were told they

23    weren't going to be doing it anymore.

24          **THE COURT:**  What affidavit says that?

25          **MR. KUSIAK:**  Well, we believe -- number one, my

1    client's affidavit says that's what they believed, that they

2    were told --

3        **THE COURT:**  What affidavit, from an independent

4    third party what affidavit says that?

5        **MR. KUSIAK:**  From Mr. Coontz who says --

6        **THE COURT:**  Pass it up here.

7        Well, you properly referred to it in the first

8    instance.  Entered into a contract, provided general

9    contractor services for the trade show, advised in the

10   contract that the contract was for the specific event,

11   Champion had no further rights to produce that event.

12       Suppose I accept that.  Or I see no reason why I

13   shouldn't accept it.  That doesn't mean they can't, a

14   reasonable reading doesn't mean they can't bid on doing that

15   event for the next year.

16       **MR. KUSIAK:**  Our client's understanding when they

17   contacted CCSA to bid was that Champion was no longer doing

18   that event.

19       **THE COURT:**  Hold, hold that thought.  I don't want

20   to cut you off.

21       So, now here's this affidavit.  So, what does the

22   injunction say about your -- you only had the one event.

23   You were notified for the one event for that year.  You were

24   notified you had no further rights.  What do you think gives

25   you the right to say that they violated it when they bid on

1     that event?

2          **MR. WINTON:**  Your Honor, this is exactly the type

3     of situation that the order, the Stipulated Injunction was

4     meant to avoid.

5          **THE COURT:**  Yes, read --

6          **MR. WINTON:**  And the language in the Stipulated

7     Injunction says, and this is paragraph 1 of the Stipulated

8     Injunction, for the three year period beginning April 21st

9     through April 21st, 2014, right, and then we move to the

10    next page, it says will not directly or indirectly -- sorry,

11    end of that page, will not directly or indirectly solicit or

12    provide any services of any type or in connection with any

13    Champion Event.  So, let's define Champion Event.  Defined

14    as a specific trade show, exposition or similar event which,

15    when it most recently occurred, provided such event occurred

16    within the three years prior to April 21st, 2011 was

17    produced by Champion.  Right?

18          So let's stop there.  So a Champion Event is

19    already defined.  It's clearly a Champion Event because it

20    was produced by Champion in the spring of 2011.  So now

21    we're talking about -- that's clear.  The only time, the

22    only time it's not is, we move down the paragraph, it says

23    provided, however, middle of the paragraph, that a Champion

24    Event shall not include a trade show, exposition or other

25    similar event if prior to April 21st, 2011 Champion was

1    advised that it would no longer be producing the event.

2    Champion was never -- all they were told was that this is a

3    one year contract.  You're free to bid just like anyone

4    else.  They were never told they would not be producing a

5    2012 event, your Honor.  And, in fact, they were told the

6    opposite.  They were invited to bid on that 2012 event.  All

7    that Nexxt needed to do, as your Honor made clear the last

8    time we were here before on a motion for contempt, is that

9    they needed to be careful because they had an order that

10   they had to abide by, and they needed to be, they needed to

11   act in a way that was prudent.

12           **THE COURT:**  All right.

13           **MR. WINTON:**  And they should have asked, hey,

14   Champion, are you bidding on this, or ask CCSA are they

15   bidding on it.

16           **THE COURT:**  That's, that's the answer.

17           **MR. KUSIAK:**  Judge, with all due respect to my

18   opposing counsel, if there was evidence that they had been

19   invited to bid on that particular contract surely you would

20   have seen that evidence, and it is not before you.  There is

21   no evidence that they were invited to bid on that contract.

22   And our understanding, Judge --

23           **THE COURT:**  No, I understand your understanding.

24           What do you say about this solicitation?

25           **MR. KUSIAK:**  Okay, two more points I would like to

```
 1    make on this --

 2              THE COURT:  Briefly.

 3              MR. KUSIAK:  -- Judge.

 4         The first point is our client had a long track

 5    history of obeying this injunction.  In October of 2011, my

 6    client received an RFP from the American Speech and Language

 7    Hearing Association that would have netted them over

 8    $800,000 if they had responded to that bid.  They did not do

 9    so because they knew that this was a Champion client.

10         Same is true in February of 2012 when they received

11    an offer to submit a proposal for the American College of

12    Physicians which would have netted them over a million

13    dollars and they chose not to because it was a client.

14         It defies common sense, Judge, in this case where

15    this CCSA event nets them only a few thousand dollars that

16    they would obey the injunctive order for cases that were

17    going to make them a lot of money but sneak around and try

18    to avoid it for an event that was going to make them next to

19    nothing.

20         The other point I would like to make, Judge, is

21    that when, as soon as they found out from Champion, and keep

22    in mind it took Champion two months after they found out

23    that Nexxt had bid on this event, two months later they

24    finally said something to Nexxt Show and said no, you can't

25    do that, we were going to bid on that event.
```

1          Immediately when they said that, Nexxt said, okay,

2     fine, if you say that was one of your clients we'll back

3     off.  So, we have a number of choices.  And the choices that

4     we offered them were, number one, you take the event and

5     we'll tell the client whatever you want us to tell it so

6     that it looks like it's our fault, not yours, no loss of

7     goodwill.  They rejected that.  Number two, we'll do the

8     event and we'll pay you the money and we'll also tell the

9     client anything you want with respect to it's our fault, not

10    yours.  They rejected that.  Not only did they reject those

11    options, they refused to even discuss them, wouldn't even

12    discuss them, so that we could reach some sort of compromise

13    where they were not being injured at all.

14         Mr. Pabian, Jay Pabian here is the corporate

15    counsel who engaged in those discussions with opposing

16    counsel, and he can tell you in detail exactly what went on

17    in those discussions if you would like to hear that.

18         Finally, we said, well, we're not going to do the

19    event because you're going to bring some sort of claim

20    against us if we do the event.  So we dropped out and a

21    small company called AES ended up taking over the event and

22    doing it.  They then claimed, well, we didn't have time to

23    do it.

24         Freeman is a huge company.  Some of the statistics

25    on Freeman, it's one of the largest companies in the United

1  States that does this kind of business.  They do 4,300

2  expositions annually.  They do over 11,000 corporate and

3  special events.  This is from Freeman's catalog.  AES is

4  one-one-hundredth the size of this, and they were able to

5  successfully do this event in a few weeks.  So the excuse

6  that they've given you in writing that they could not have

7  done this because they didn't have the time is belied by two

8  facts, the affidavit that you have from AES, that's the

9  affidavit of Mark Staples, that says they were able to do

10  it, a tiny, little company was able to do it in the time

11  given, plus the fact that they waited two months before they

12  even complained about it, plus the fact that we also offered

13  to help them do it if they decided to do it.

14         **THE COURT:**  How -- this is not to draw any

15  conclusions, but this is not now a pure what's equitable

16  here.  This Court has entered an order and the order has

17  sanctions that follow a violation of the order.  The order

18  was carefully crafted by attorneys, attorneys representing

19  their separate corporate viewpoints.  So, why is it not

20  simply a calculus of whether the order was violated?  And if

21  it was violated then the remedy is the stipulated fine.

22         **MR. KUSIAK:**  For two reasons, Judge.  Number one,

23  the order incorporates verbatim the settlement agreement

24  that was reached by the parties.  The Court -- there was no

25  hearing about it in front of the Court or anything like

1  that.  The Court simply took the settlement agreement and

2  made it into an order.

3         THE COURT:  That's right.  That's right.  I have a

4  memory of these events.

5         MR. KUSIAK:  Okay.

6         THE COURT:  And you're right.  But competent

7  counsel worked out the settlement agreement.  So I accept

8  what you just said.

9         MR. KUSIAK:  There was no analysis, none

10  whatsoever, and my brother says nothing different, he

11  provides no evidence to the contrary, there was zero

12  analysis given to that $250,000 liquidated damages

13  provision.

14         THE COURT:  Well, why should I go back on it now?

15  It was agreed to.

16         MR. KUSIAK:  For the simple reason, Judge, that

17  just because -- the public policy behind liquidated damages

18  as the SJC and this Court has said itself numerous times is

19  that the whole purpose of contract law is to find a fair

20  resolution that remedies, gives people damages for their

21  injuries, not to provide outrageous windfalls.  The SJC has

22  said that, this Court has said that, and the Supreme Court

23  has said that.

24         THE COURT:  And you think given the actual damages

25  here, or given the things that you were prepared to do, a

1   $250,000 fine would be an outrageous windfall.

2        **MR. KUSIAK:**  There are zero actual damages.  None.

3   Not a single dollar in damages.

4        **THE COURT:**  Well, what would they have earned if

5   they had done the show?

6        **MR. KUSIAK:**  A couple thousand dollars, maybe.

7   Maybe nothing.

8        **THE COURT:**  All right.  How about the second issue?

9        **MR. KUSIAK:**  The second issue, Judge, is, what you

10  heard is that these went out directly to individuals through

11  this company that my client hired.  What, what Mr. Winton

12  has made it sound like is that my company hired an

13  intermediary to go out to individuals that it knew were

14  Champion's clients instead of doing it itself.

15       **THE COURT:**  No, no, that reads too much into what

16  he said.  Here's what I get from it.

17       **MR. KUSIAK:**  Okay.

18       **THE COURT:**  Given the fact that my order -- I may

19  have adopted what the parties laid before me, but now

20  there's an order of this Court.  Now, given the fact that

21  there is an order of this Court out there, he says you

22  people hire an intermediary that does a blanket solicitation

23  without regard -- no one says you targeted people who were

24  defined under the terms of this order as Champion clients.

25  It's just that you didn't work around them.  You just did a

1    blanket solicitation which the order forbids.

2         **MR. KUSIAK:**  Well, how would we have worked around

3    it, Judge?  They refused to give out their client list so we

4    don't know what their list of clients are, and EXPO Magazine

5    doesn't give out its list of people it sends its e-mails to

6    which are 15,000 people.  So --

7         **THE COURT:**  Isn't that, and I mean no disrespect,

8    isn't that your problem?

9         **MR. KUSIAK:**  No, Judge, and here's why.  What -- an

10   injunctive order like this which says thou shalt not

11   solicitate, solicit, is no different than a nonsolicit that

12   you see in the employment context every day.  If an employee

13   goes from company A to company B under a nonsolicit

14   agreement that means that the employee may not go himself or

15   through an intermediary back to employees of company A and

16   solicit them to come to company B.  What it does not mean

17   and has never been construed to mean is that company B

18   cannot put an advertisement in a newspaper for employees or

19   on television or on the radio or anything like that and say,

20   hey, we're a great company, come and join us.  Some of those

21   ads surely will be seen by employees of company A and

22   everybody knows that.  But it's never been construed to mean

23   anything like that.

24        This is exactly the same.  There is no difference

25   here.  What we've done is said here's a general

```
 1    advertisement that we would like to put out.  We give it to

 2    EXPO.  EXPO sends it out to all sorts of people who

 3    subscribe to its service, just like people subscribe to a

 4    newspaper or a magazine.

 5              THE COURT:  I understand the argument.

 6              What do you say to that?

 7              MR. WINTON:  With respect to --

 8              THE COURT:  That that's an unreasonable reading of

 9    my order.

10              MR. WINTON:  I believe it is, your Honor,

11    because --

12              THE COURT:  No, no.  You believe it is a

13    reasonable -- well, you tell me.  I understand his argument.

14              MR. WINTON:  We're just talking about the e-mail

15    solicitation at this point?

16              THE COURT:  That's what we're talking about now.

17              MR. WINTON:  Yes.  So, it's not a newspaper

18    article, not a newspaper advertisement or a television

19    commercial.

20              THE COURT:  No, it's a flier.

21              MR. WINTON:  What's that?

22              THE COURT:  It's a flier.  It's an e-mail.

23              MR. WINTON:  Well, it's not even a flier.  It's an

24    e-mail personally addressed to someone's e-mail address.

25              THE COURT:  Fine, but you can personally address
```

1    things, yes.

2         **MR. WINTON:**  Right.  But you can't personally

3    address things when they're personally addressed to

4    forbidden Champion Events.

5         **THE COURT:**  But how are they to know who your

6    clients are?

7         **MR. WINTON:**  Well, your Honor, that's why the

8    order, specifically the Stipulated Injunction defines who

9    our clients are.

10        **THE COURT:**  Well, of course.  But if I wanted to

11   know the array of people specifically, company by company,

12   who are defined Champion clients as of the time my order

13   entered, how would I do that?

14        **MR. WINTON:**  Well, your Honor, they could simply

15   request it, which they never it.  And in fact --

16        **THE COURT:**  He says you wouldn't give it to them.

17        **MR. WINTON:**  Well, he's, with all due respect,

18   counsel's been on this case for about a month.  There was

19   prior --

20        **MR. KUSIAK:**  Prior counsel indicated to me that

21   they did ask for such a list.

22        **THE COURT:**  Please, please, please.  All right.  So

23   there's a dispute over that.

24        **MR. WINTON:**  Well, there's actually even no

25   dispute, your Honor.  Because the way this industry works is

1    that everyone knows who's produced the last show for

2    different events.  And that's why they knew who had

3    produced, for example, the CCSA show.  And it's almost as if

4    they didn't ask for -- but, your Honor, I will testify, put

5    myself on the --

6            THE COURT:  You can't testify.

7            MR. WINTON:  It was never, it was never requested

8    of us.

9            THE COURT:  Well, you can't testify.

10           MR. WINTON:  I know.  And there was no, there was no,

11   no request and I haven't seen an affidavit stating that

12   there was such a request from any prior counsel.

13           THE COURT:  All right.

14           MR. WINTON:  And the reason why there wasn't is

15   because they may have wanted to do this exact same thing and

16   say, well, we don't know who the customers are so this must

17   be an innocent thing.  The fact is that when they're, when

18   they're bound by a Court order they need to be prudent and

19   careful.  So they can't just go out and say to a third party

20   send this out to everyone.  I know it's a solicitation and

21   I'm trying to get business.  If it goes to some people who

22   are restricted, so what, you sent it, we didn't send it.

23           THE COURT:  All right.

24           MR. WINTON:  They can't do that, your Honor.

25           THE COURT:  All right, here's how we're going to

```
 1    proceed.

 2           The Court takes this matter very seriously, and the

 3    representations, the arguments of counsel are skilled and to

 4    the point on both sides.  They reveal significant factual

 5    differences.  It would -- and the potential damages, I just

 6    want to be clear here, you don't think, everything going

 7    your way, you get more than a half a million dollars, do

 8    you?

 9           MR. WINTON:  Well, your Honor, I don't know how

10    many people they sent this to.

11           THE COURT:  Oh, you think you're going to get

12    $250,000 per customer?

13           MR. WINTON:  I can only ask, your Honor.

14           THE COURT:  Per --

15           MR. WINTON:  Per occurrence it says.

16           THE COURT:  Yes, per occurrence.  And you think an

17    occurrence is a single mailing.  And let's say it goes to

18    four, because I can do the math, four defined Champion

19    clients, you think you're going to get a million?

20           MR. WINTON:  Well, your Honor, I can only --

21           THE COURT:  Ask.

22           MR. WINTON:  -- request that on behalf of my

23    client.

24           THE COURT:  You tell your client that's unlikely.

25           MR. WINTON:  Understood, your Honor.
```

1        **THE COURT:**  But a half a million seems to be very

2    much in play, subject to his argument.

3        Now, here's what -- half a million dollars is

4    significant money.  It would be improvident for me to

5    adjudicate any matter like this on affidavits and I'm not

6    going to, because reference has been made to producing

7    witnesses and what they would say, and I can think of

8    questions that witnesses should be asked.

9        So, we're going to have to have an evidentiary

10   hearing on this.  I didn't ask for it this afternoon.  I

11   don't expect to begin it.  It will be a trial.  And it's

12   limited to these two, because I see it as two occurrences at

13   maximum, and we'll find out who told what to whom and we'll

14   see the actual e-mails and requests or lack thereof and

15   solicitation for bids and lack thereof and then we'll figure

16   it out.

17       Now, the fact that I say, probably too glibly, that

18   a half a million dollars is in play here, it is in play, but

19   I will tell you that the defense argument resonates with the

20   Court.  Whether I allow them now to challenge this

21   stipulated amount will depend upon the decided cases.  So,

22   we will -- I invite further briefs as to that.  I think it's

23   important that we get to this promptly.

24       Let me consult with the clerk.

25       (Whereupon the Court and the Clerk conferred.)

1        **THE COURT:**  So why don't I put this down for a

2  trial to commence Tuesday, the 17th of April.  I can't

3  believe this will go too long, three days, three mornings of

4  trial should be sufficient, and we'll allocate that amount

5  of time.

6        **MR. KUSIAK:**  Judge, if I could interject?

7        **THE COURT:**  Yes.

8        **MR. KUSIAK:**  That's, that's school vacation week.

9        **THE COURT:**  So it is.  And I'll honor that since

10  I'm -- we won't do it then.  It happens I'm gone the next

11  week.  So let's -- but we won't do it then.  That's too

12  short, without giving you a chance.

13        (Whereupon the Court and the Clerk conferred.)

14        **THE COURT:**  We'll say Thursday, the 10th of May.

15  And we'll give you two days that week and see if we're done.

16        So it's on for trial Thursday, the 10th of May.

17  Treating this, trying to save you money here, treating this

18  as the pretrial conference, it's limited to the two

19  occurrences, the production of this solicitation and

20  production of this California show and what happened with

21  respect to that, and this e-mail solicitation.  At most, and

22  I think I can adjudicate this on the record that's before

23  me, these are two occurrences under the terms of the Court's

24  order.

25        Now, I mean to encourage settlement, but I mean to

1    enforce my order.  If you settle this then fine, all you

2    need do is call Ms. Gaudet and we'll take it off the list.

3    But if it's not settled, I will settle it.  And so be ready

4    for trial on the morning of the 10th of May.  I have a

5    criminal case that may crowd into that, but you check with

6    Ms. Gaudet because I think we'll be ready on the 10th of

7    May.

8            Are there any questions?  Start with plaintiff.

9        **MR. WINTON:**  Yes, your Honor.  If there's any

10   limited discovery taken in advance of the hearing is that

11   permissible?

12       **THE COURT:**  What do you need discovery on?

13       **MR. WINTON:**  Well, I don't know what Mr. Epstein --

14   I only have Mr. Epstein's affidavit as to the basis for his

15   belief as to why he could solicit CCSA.

16       **THE COURT:**  Well, candidly, I don't -- what his

17   belief was doesn't cut much mustard with me.  It's what

18   happened.

19           Now, I think you may well need discovery, and I'm

20   not foreclosing it, but you need discovery from third

21   parties here.

22       **MR. WINTON:**  Potentially.

23       **THE COURT:**  You need to take depositions of these

24   people in California or wherever.  The clients need to be

25   deposed so I know exactly who said what to whom.  And I need

1   evidence, not just, not just these affidavits.  As I've said

2   in another context, affidavits are the Potemkin villages of

3   American litigation today, all lawyer constructed facade and

4   no interior architecture.  So we need -- I think your client

5   wants to say something.

6        **MR. KUSIAK:**  This is actually not my client, this

7   is corporate counsel for --

8        **MR. PABIAN:**  Your Honor?

9        **THE COURT:**  He may be, but you're arguing the case.

10       Yes, sir?

11       **MR. PABIAN:**  Your Honor, I have been corporate

12   counsel and I was involved when the first calls came in.

13       **THE COURT:**  Right.

14       **MR. PABIAN:**  I know I play a very small role in

15   this, but my daughter's college graduation in South Carolina

16   is that week.  So if there's any chance we could do it the

17   following week, I would really appreciate it.  We rented a

18   place for the --

19       **THE COURT:**  Oh, no, we're going to let you go.  But

20   you're going to have to appear by deposition.  So your

21   deposition will be taken.  They'll get all the information

22   they need from you.

23       **MR. PABIAN:**  Okay.

24       **THE COURT:**  But I will accept your deposition.

25   Counsel will understand that we're going to let the

1    gentleman be at his daughter's graduation and you're going

2    to have to schedule the deposition and get everything he has

3    to say and I will review it.

4            **MR. PABIAN:**  Thank you very much, your Honor.

5            **THE COURT:**  No.  Perfectly appropriate.  This is

6    not the usual run up to a trial where I get counsel to

7    agree.  That's why I caved so easily on school vacation.

8    But I think it must be promptly dealt with and I intend to

9    do that.  It's on for the 10th of May.

10           **MR. WINTON:**  Your Honor, as to discovery, is there

11    some type of expedited discovery order which should be

12    agreed to between the parties?

13           **THE COURT:**  Well, I expect you to agree.

14           **MR. WINTON:**  Yes.

15           **THE COURT:**  And if there's any problem we'll see

16    about that.  But candidly, you're going to subpoena these --

17    we'll see the parties from each side.  It's the third

18    parties we want, and now you accommodate corporate counsel,

19    he'll have to testify and testify under oath, but he's going

20    to be at his daughter's graduation.

21           **MR. PABIAN:**  Thank you, your Honor.

22           **THE COURT:**  All right, that's how we'll proceed.

23           **MR. WINTON:**  Thank you, your Honor.

24           **THE COURT:**  Thank you.  We'll recess.

25           **THE CLERK:**  All rise.

1         (Whereupon the matter concluded.)

2

3

4                **C E R T I F I C A T E**

5

6

7        I, Donald E. Womack, Official Court Reporter for

8   the United States District Court for the District of

9   Massachusetts, do hereby certify that the foregoing pages

10  are a true and accurate transcription of my shorthand notes

11  taken in the aforementioned matter to the best of my skill

12  and ability.

13

14

15

16

17       /S/ DONALD E. WOMACK 3-29-2012
          —————————————————————————————

18         DONALD E. WOMACK
        Official Court Reporter

19          P.O. Box 51062
      Boston, Massachusetts 02205-1062

20        womack@megatran.com

21

22

23

24

25